And the final case on the regular argument calendar to be argued is Doroz v. Tect Utica Corp. Mr. Doroz, why don't you just stand at the podium there, and you have five minutes for argument. Wait, wait. One second. Good morning. My name is Cristo Doroz, and I came to this court to make an argument. Really, I don't have a study. Speak right into the microphone. I'm sorry. I did not study law in my life, but I studied technology, electronics, electricity. I am here in this court to make something, opposition, which Tect Corp. did something wrong for me because they terminated my job because they said that I violated the rules, that I did not leave the premise from factories. But first of all, I found that I would like to go first to the office and explain to them that I have a medical reason. But instead of permitting me to go to the office, it means giving me the opportunity to humanize, so to tell them that I have a reason, a medical reason. So they call it for police and remove me from facility, from Tect Corporation. It is located in Eureka, New York. And actually, I have the additional report from another court from the Department of Labor, Albany, New York, another court of argument and decision of other judge that he found really that I was improperly terminated my job from factory where I worked for five years. And this report I have over here, but I'm not sure that I supplied before to this court or not. And I don't know what I have to say because, as I said, I didn't study law, so I do not tell this properly. A procedure must be done. This is all I have to say. So you are complaining of discrimination? Excuse me? You are complaining of discrimination? Yes, based on discrimination and based on broken rules in the factories, in the plant. Your adversary says that you refused to do the job that you were assigned to do by your superior. Actually, I don't know. And based on what they ask me that I refuse the job. Well, before I have the opportunity, I found that this first priority is go to the office, HR office, human resource office, which I can explain that I cannot to do more heavier job, which is require more motions. Use the hammer, special hammer, because I have this written on my left hand from another doctors. And I think that would be good. The best idea, I think, so I try to find, go to the office, make explanation from the office, from other superior, this office, that I cannot do this job, which I'm really, I am doing right now. Because the job that I was doing before was much lighter and did not hit me so much, you know, and judge me for my duties when I'm doing this. So there is a lot of accounts in this place where I worked before, because it was not only based on discrimination. I was called, for example, my nationality is from Poland. In the United States, I came over here in 1991. In many cases, many situations, I heard in my environment that I'm working over there, that one gentleman, he was African-American gentleman. He called me very often as Polack. So that's around, surrounded by coworkers. I didn't take it into consideration so much, but just only think that maybe he's making joking, but maybe supervisor, my supervisor, Bill Brown, he may be on base of this, what he says, many in a single day of these awards. Maybe he just only type it. Some people, I understand, they don't like all the nationality. It looks, seems to me, this Bill Brown, his name was supervisor. I think that my opinion is that he seems to me, he became angry on me, and really he started the process that he implied me that he told that I refused the job, which he told me, but really he never came to me. He first about the job told to my group leaders. But I know that my group leaders, which is George, he was the same day hired, almost when I was hired to the company. Very often, this gentleman, he make the joke, and I assume that this gentleman seems to make joke because I found that his supervisor, newest supervisor, he really needs me in different jobs. He should come in to me and directly told me, hey, Christopher, I have something to do for you. So on base of this, he took me to the office. He started checking his phone, his pocket phones. He started counting, one, two, three, four, five. If you do not do this job, I will call for police. In this moment, I decide put my apron on the chair, and I decide go to the office. In this moment, another supervisor, he make physically me blockage. He asking me, Christopher, where you have to go? I said, I want to go, sir, to the office, explain, because I got something to explain. Actually, I did not say that because I cannot because this is my personal privacy information. I cannot say just around surrounded people that, hey, gentlemen, I have disability, and I don't want them to take different jobs. That explains why you are reluctant to say anything. But is there anything else, Mr. Giroir? Your time is technically up, but is there anything else that you think we ought to know? We have the record of your case. We've got your submission. Is there anything else? No, I understand. I have five minutes. So we'll hear from Mr. Turner. And if you would just sit there while Mr. Turner gets up to the podium. Thank you, Your Honor. That would be great. Mr. Turner. Thank you, Your Honor. May it please the Court. Mr. Giroir was terminated from his employment by tech as a result of his flagrant insubordination by refusing to follow the directions of his supervisors to move to a different department, something, by the way, that was specifically allowed under the terms of the collective bargaining agreement that was in place at that time. And he subsequently refused to leave the plant after his supervisor told him he was suspended. He was suspended because he refused to move to another department. He declined to leave the plant at that point in time. That resulted in tech having to call the police. His union representative was also brought into the scene and conferred with Mr. Giroir while this was going on. The police came, and as a result of the trip by the police to the plant, Mr. Giroir eventually left. He was terminated before he left the plant. There is some dispute over what he heard or what he knew as to whether or not he was terminated. The HR manager who came to the plant testified that she told him that he was terminated. She also gave him a writing. When he testified, he originally indicated he couldn't recall whether he'd been terminated and later seemed to say that he wasn't. But there's no question that he knew the following day when he came to the plant, sat in his car in the parking lot because he knew he couldn't enter the plant, ended up having a conversation in the parking lot with the general manager of the plant, asking the general manager if the general manager would give him three days of suspension for his insubordination, which the general manager declined. He certainly knew that he was terminated at that point in time. Mr. Giroir's union declined to file a grievance on his behalf. They did request that his employer, the appellee, enter into a last chance agreement. Last chance agreements are infrequently entered into in text procedures, and they declined to do it. And the reason that they declined to do it was because of the severity of his insubordination and because they were genuinely concerned about the possibility of workplace violence. That's something that unfortunately is experienced on a more than regular basis in this day and age. Mr. Giroir had never had a previous problem at the plant. He was behaving in a very uncharacteristic fashion, I would suggest bizarre fashion, and his employer was genuinely concerned that there could be a problem with workplace violence, and there was concern expressed among the workers in the plant as well. The material facts in this case are undisputed and in large part are based upon Mr. Giroir's own testimony. His supervisor, Mr. Brown, asked him at least two times, and probably more than two times, to move from the grinding department, where he regularly worked, to the stamp department. He declined. He gave no explanation as to why he refused to go. He made a mention of medical issues. He never told his employer that he had medical difficulties. They had no idea that he was making any such type of claim. If he had said that, I'm certain that somebody would have addressed that issue, but he never raised it. He simply said he was not going to go. And in his own testimony, he said, I neither said I was going or that I wasn't going, but he didn't go. And after his supervisor, Mr. Brown, on these several occasions, asked him to move to another department, and he refused, Mr. Brown, who had brought in his union representative at the time, told him that he was being suspended for the day and that he needed to leave the premises. And he again refused. The HR manager from the plant came onto the floor. She directed him to leave the facility, and he declined to do it. So the police were called. One police officer showed up, had a conversation with Mr. DeRose, and again he did leave the facility. A second police officer came, and eventually he left. And as I suggested before, he was terminated by Ms. Prentiss, the HR manager, before he left the plant. Those facts seem to take care of all of the legal issues in this case. He's claiming that he wasn't terminated as a result of insubordination, but as a result of national origin discrimination, but there's absolutely no evidence whatsoever, no competent evidence, to support it. He maintained at one time that a co-employee repeatedly called him a Pollock, but he never reported it to management, and he admitted in his sworn testimony and his deposition that management wasn't aware that this was going on in the plant. We have the benefit, I think, of the rest of your argument. Is there anything that you absolutely must say? I think it's covered in the paper. Thank you very much, Mr. Turner. We'll reserve the decision, which, Mr. DeRose, that just means that we will decide in open court right now. We'll reserve the decision.